Michael W. Carmel (#007356)
MICHAEL W. CARMEL LTD.
80 E. Columbus Ave.
Phoenix, Arizona 85012
Telephone: (602) 264-4965
Fax: (602) 277-0144
michael@mcarmellaw.com

Proposed Attorneys for Debtor

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| In re: | Chapter 11 |
|---|---|
| PHOENIX HELIPARTS INC., | Case No. 2:15-bk-12003-DPC |
| Debtor. | **DECLARATION OF ANDY GUTIERREZ IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS**<br><br>Hearing Date: Not Yet Set<br>Hearing Time: Not Yet Set |

I, Andy Gutierrez, declare as follows:

1. I am a resident of Maricopa County, Arizona. I am over the age of eighteen and am competent to testify to the matters set forth herein.

2. I am the controller and director of human resources at Phoenix Heliparts Inc. ("Debtor"), and as such I have personal knowledge of the matters set forth herein. I hold a bachelor of business administration degree in accounting from American Intercontinental University.

3. I have held the position of controller at Debtor since June 2014. Prior to joining Debtor, I worked for nearly three years as the controller for Lyons Roofing, one of the largest roofing companies in Arizona. Prior to that time, I was the controller for Brams Electric for more than three years. I have also been an accountant and partner for nearly ten years in Accountechs, a company providing tax, payroll, and accounting services to realtors and small business owners.

# I. BACKGROUND.

4. Debtor is primarily engaged in providing maintenance services, parts sales, engineering, supplement type certification issues, avionics, and structural repairs for aircraft. Debtor specializes in MD Helicopters (particularly the MD 500 and all variants thereof).

5. Debtor's customer base is worldwide, and includes government agencies and private companies such as Boeing, the City and County of Honolulu, the U.S. Department of State, and the Republic of South Korea Army. Debtor operates primarily from its location in Mesa, Arizona, which is where the corporate office resides. A satellite office in Hawaii also provides services there.

6. Debtor's business was founded in 2003 by Tina and Darin Cannon, working out of a garage in Mesa, Arizona. Over the last twelve years, Debtor has grown into a successful business with more than forty employees and a significant customer base.

7. Debtor has five active contracts to provide ongoing services on, and parts for, various aircraft. The majority of aircraft serviced by pursuant to Debtor's active contracts are owned by military and paramilitary agencies, who use them for air rescue, firefighting, and police efforts. It is vitally important that Debtor continue to provide its services and parts for these aircraft in order to protect human lives.

8. Debtor has grown its business without using a highly leveraged business model. In fact, Debtor has only one credit facility for operational liquidity from JPMorgan Chase Bank, N.A. ("JPMC"), and one vehicle financing loan from Ford Motor Credit Company.

9. Debtor is the borrower under a promissory note dated December 31, 2014 in favor of JPMC in the principal amount of $750,000. In connection with the JPMC loan, Debtor delivered to JPMC that certain Commercial Security Agreement dated December 31, 2014 pursuant to which I understand JPMC asserts a lien on all of Debtor's inventory, chattel paper, accounts, equipment, general intangibles, and all proceeds therefrom.

10. As of September 18, 2015 (the "Petition Date"), Debtor was indebted to JPMC in the principal amount of $750,000, plus any interest accrued but unpaid thereon. Debtor makes monthly interest-only payments on the JPMC note obligation, and to my knowledge was current

787060.3                                    2
Case 2:15-bk-12003-DPC    Doc 5    Filed 09/18/15    Entered 09/18/15 16:13:32    Desc
                          Main Document    Page 2 of 11

and was not in default as of the Petition Date. The JPMC note matures on May 1, 2016, when all principal and any accrued but unpaid interest is due under the note.

11. In connection with its loan, JPMC also obtained guaranties from Darin and Tina Cannon, Donald P. Nichols, and Georgia A. Summers. Certain of the guaranties are secured by assets owned by the applicable guarantors. In addition, that certain Control Agreement and that certain Commercial Pledge Agreement, both dated December 31, 2014, were delivered to JPMC with respect to certain assets owned by the 2014 Complete Restatement of Trust of Don P. Nichols dated 9/2/1988.

12. The Ford Motor Company loan has an outstanding balance of $26,555.32. The loan is secured by a Ford truck used in Debtor's business operations. Debtor makes monthly payments of $1,117.63 on the loan, has made all required payments prior to the Petition Date, and to my knowledge was not in default as of the Petition Date.

13. Debtor's other business indebtedness is largely unsecured trade debt, which typically runs in the range of $500,000-$900,000 per month in the aggregate. Debtor pays its trade debt in the ordinary course of business. Debtor's monthly revenues typically run in the range of approximately $600,000-$1,100,000. As of the Petition Date, Debtor was indebted to trade vendors in the approximate aggregate amount of $1,357,998.32. Timely payment of certain of these vendor claims is critical to Debtor's ongoing operations, as discussed more fully below.

14. Debtor's business operations have been generally healthy and did not precipitate the need for this chapter 11 filing. Rather, in October 2011, Debtor was named in a lawsuit in Maricopa County Superior Court by TKC Aerospace Inc. ("TKC"). In the lawsuit, TKC asserted counts for misappropriation of trade secrets, interference with business expectancy, and related claims.

15. After several years of litigation, the Superior Court entered judgment against Debtor on May 15, 2015 in the amount of $20,295,782.58, plus certain costs and attorneys' fees (the "State Court Judgment"). Debtor strongly disputes, and has appealed, the State Court

Judgment, which has been stayed pending appeal provided that Debtor posts a bond in the amount of $6,765,260.89 by no later than Wednesday, September 16, 2015, at 12:00 p.m.

16. Because of Debtor's inability to post the bond, and the disruption or total cessation of business should TKC execute on the State Court Judgment, Debtor has concluded that the interests its creditors, customers, and employees will be best served by a reorganization under chapter 11 of the Bankruptcy Code.

## II. PAYROLL AND RELATED EMPLOYEE OBLIGATIONS.

17. As of the Petition Date, Debtor employs 41 individuals who provide the requisite technical and administrative services that Debtor requires for operations. The long-term success of these operations depends on Debtor's ability to maintain its current experienced workforce. However, merely because of the timing of the Petition Date, a portion of salary and benefits owed to employees that accrue daily are pre-petition obligations. The financial hardship to employees that would result if Debtor is unable to satisfy these pre-petition obligations would sorely prejudice these employees and, consequently, jeopardize Debtor's ability to keep its workforce intact and maintain the smooth functioning of its business operations.

18. Debtor's employees primarily perform work for Debtor from Debtor's principal place of business in Mesa, Arizona and a satellite office in Honolulu, Hawaii.

19. Most of Debtors' employees are paid on an hourly basis, bi-weekly, and the remainder are paid a salary bi-weekly. Debtor's payroll is approximately $106,322.32 in the aggregate every two weeks. The aggregate payroll amount includes any bonuses, holiday pay, paid time off, and overtime pay remitted to the various employees. Debtor performs its own payroll services and does not rely on an outside provider.

20. Debtors' payrolls are paid on Fridays, covering the two prior complete weeks. The payroll on Friday, September 18, 2015-funded on September 16, 2015, for example, covered services performed for the period of Sunday, August 30, 2015 through Saturday, September 12, 2015. The subsequent payroll, which will be paid Friday October 2, 2015, will include five (5) days' payroll for the pre-petition time period of September 13, 2015 – September 17, 2015.

787060.3

4

21. As of the Petition Date, Debtor's payroll was substantially current as to payment, but as a result of the timing of Debtor's chapter 11 filing, Debtor's salaried and hourly employees are owed salary and wages on account of what now constitutes pre-petition services. Debtor believes that such amounts will not exceed $55,000 in the aggregate. No employee's unpaid pre-petition salary or wages exceeds the $12,475 threshold provided in Section 507(a)(4) of the Bankruptcy Code.[1]

22. Nearly all employees receive direct deposits. On rare occasion, employees are issued checks. For the pay period ending prior to the Petition Date, such checks (if any) may not have cleared as of the Petition Date.

23. Included in the aforementioned gross payroll amount are the employees' contributions to various retirement and other employee benefit plans and programs provided by Debtor and Debtor's portion of payroll taxes.

24. To maintain the loyalty of Debtor's employees, it is essential to fulfill the obligations arising from certain employee benefit programs. Debtor has established employee benefit plans and policies, including medical, dental, vision, prescription drug, disability, 401(k), vacation pay, sick pay, and holiday pay. Various employees are entitled to participate in the programs described below.

    a. <u>Medical, Dental, Vision, and Prescription Plans</u>: Debtor makes available to its employees medical, dental, vision, and prescription plans. The net monthly cost to Debtor of these plans is approximately $8,700.

    b. <u>Disability Plans</u>: Debtor provides its employees with short-term and long-term disability plans. The plans are insured through a single carrier. The net monthly cost to Debtor of these plans is approximately $990.

    c. <u>401(k) Employer Contributions</u>: Debtor maintains "401(k)" retirement plans for the benefit of its employees. Like most companies, Debtor provides matching

---

[1] The only insider employees receiving a paycheck are (i) Tina Cannon and (ii) Darin Cannon. Both of these individuals perform regular services. Their salaries are also below the $12,475.00 threshold.

787060.3      5

contributions to the employees' 401(k) plans. Debtor accrues the plan costs on a monthly basis, at approximately $6,100 per month.

   d. <u>Vacation, Sick, and Holiday Pay</u>: Debtor's employees are entitled to a specified number of paid vacation days, sick days, and holidays. The number of days is tied to time of service.

   e. <u>Health and Dependent Care Flexible Spending Program</u>: Debtor provides health savings accounts for its employees. Debtor deposits $125 into each employee's health savings account (for employees who obtain health insurance through Debtor) on the first payroll of each month. Employees who are not enrolled in Debtor's health insurance receive $125 in their paychecks on the first payroll of each month.

  25. Prior to the Petition Date, in the ordinary course of business, Debtor reimbursed employees for certain business expenses necessarily incurred in the scope of their employment. Historically, such expenses have averaged approximately $3,000 per month and have included, among other things, business related travel expenses, business meals, and a variety of miscellaneous expenses (collectively, the "<u>Business Expense Obligations</u>").

  26. Due to the timing of the submission and processing of reimbursement requests, the total amount of such expenses that are outstanding is not known with certainty, but Debtor believes that none remain outstanding as of the Petition Date. To the extent any remain outstanding, such Business Expense Obligations were incurred by employees on Debtor's behalf in connection with employment by Debtor and in reliance upon Debtor's reimbursement policy, so it is important to reimburse them in order to maintain their loyalty.

  27. Payroll taxes include federal, state, and local income taxes, social security, and Medicare taxes that Debtor withholds from the gross amount of employees' salaries, as well as the amounts separately owed by Debtor (the "<u>Payroll Taxes</u>"). Debtor's future liability for Payroll Taxes per payroll cycle is expected to be approximately 20% of the gross payroll amount, or approximately $21,518.49.

  28. As of the Petition Date, Debtor believes that it has paid all current Payroll Taxes.

Michael W. Carmel, Ltd.
80 E. Columbus Ave., Phoenix, Arizona 85012
Telephone: (602) 264-4965

Case 2:15-bk-12003-DPC Doc 5 Filed 09/18/15 Entered 09/18/15 16:13:32 Desc
Main Document Page 6 of 11

29. In addition, Debtor withholds amounts from employees' paychecks for items such as voluntary employee contributions to the 401(k) Plan (the "Withholding Obligations").

30. Debtor believes it has remitted all current Withholding Obligations to the appropriate recipients on behalf of employees.

### III. CRITICAL TRADE VENDORS.

31. Certain vendors supply essential goods and services to Debtor (the "Critical Vendors").

32. Support from Critical Vendors on an ongoing basis is absolutely vital to Debtor's reorganization. At this precarious stage in Debtor's business operations, an interruption in the supply of goods or services provided by the Critical Vendors would have a severely negative, if not fatal, impact on Debtors' efforts to rehabilitate and reorganize.

33. For example, some of the essential functions and goods provided to Debtor by Critical Vendors include, but are not limited to, parts that Debtor uses to perform technical modifications to helicopters used in military operations overseas. Debtor also relies on Critical Vendors to supply parts for Debtor's modifications to various aircraft used by police departments and other first responders.

34. An interruption of Debtor's service on such aircraft would not only compromise Debtor's ability to carry on its business operations, but potentially could have adverse public health and safety consequences. For military-related aircraft, an interruption of service potentially could have national security implications.

35. Debtor's senior management has analyzed Debtor's sources of supply to determine which suppliers are essential to Debtor and could create a business interruption if they were to refuse to supply goods or services to Debtor.

36. Debtor has three primary contracts for the repair and service of various aircraft. A substantial portion of Debtor's revenue is derived from its ability to perform under these contracts. The Critical Vendors supply many of the parts and services necessary for Debtor to perform under these contracts. In certain instances, the Critical Vendor Claims include tax and insurance obligations that must be satisfied in order for Debtor to continue operating.

37. To the extent possible under the circumstances, Debtor has attempted to locate alternative suppliers willing to do business with Debtor on comparable pricing and credit terms. Debtor has considered whether these alternative suppliers would be in a position to replace Debtor's current vendors without a significant service interruption. Debtor has determined that any supplier that cannot be replaced by Debtor without either a service interruption or a significant price increase is a potential Critical Vendor.

38. As of the Petition Date, Debtor owed a total of approximately $740,661.76 to the Critical Vendors. Without a seamless continuation of the goods and services provided by the Critical Vendors after the Petition Date, Debtor would experience significant decreases in revenue and a degradation in the quality, or total cessation, of services Debtor provides to its customers.

## IV. CASH COLLATERAL.

39. JPMC is likely to assert first-priority security interests in and liens upon all revenues, income, proceeds, profits, and security (the "Income") derived from the operation of Debtor's business.

40. Debtor does not have sufficient unencumbered cash or other assets with which to continue to operate its business absent use of the Income. Debtor's use of the Income to pay operating expenses, including, but not limited to, payroll, taxes, maintenance, insurance, and other expenses of operation is necessary for an effective reorganization.

41. Debtor has agreed, as adequate protection for the use of the Income or other diminution in value of the collateral of JPMC and the imposition of the automatic stay (the amount of any such diminution being referred to hereinafter as the "Adequate Protection Obligations"), to provide to JPMC a security interest in and lien upon the Income generated after the Petition Date in order to secure the Adequate Protection Obligations.

## V. CASH MANAGEMENT AND BANK ACCOUNTS.

42. Debtor's ability to continue and maintain its cash management system and existing bank accounts is essential to the efficient administration of Debtor's estate and is necessary to prevent inordinate disruption to Debtor's operations. Maintenance of Debtor's cash

787060.3　　　　　　　　　　8

management system and existing bank accounts is also essential to Debtors' ability to fund its existing payroll.

43. Debtor's ability to use its current payroll and operating checks, bank accounts, existing stationery, and other business forms during the pendency of its chapter 11 case without alteration or change is necessary to prevent an unnecessary disruption and expense to Debtor's business operations.

44. Dismantling the cash management system or altering it significantly would cause harm to Debtor's ability to efficiently and effectively manage its cash, accounting functions, and operations, and would create disruptions in the timely receipt of cash collections from customers and the payment of post-petition obligations, which would have a significant adverse effect on Debtor's operations.

45. Debtor maintains five bank accounts at JPMC, which is an approved depository institution by the United States Trustee for the District of Arizona. Debtor believes preservation of its existing cash management system is also an additional measure of adequate protection that will be required by JPMC.

46. Debtor maintains an operating account as the primary account to make ordinary-course payments and deposits. Debtor maintains a separate account for payroll checks and payroll-related expenses and taxes. Although most employees have direct deposit, the occasional reimbursement, correction, or termination check is drawn on the payroll account. Debtor also maintains a "receiving account" for deposits from wire and EFT payments. The receiving account is a savings accounts, and accordingly, transfers out are limited to six or fewer per month. Generally, one transfer per week is made from the receiving account to the operating account.

47. In addition to the operating, payroll, and receiving accounts, Debtor has two accounts that it does not use and has not used for at least two years. The accounts have balances of less than $600 each. Debtor intends to close these accounts.

48. As indicated above, Debtor's disbursements for accounts payable and other expenses are drawn on the operating account, and payroll and related expenses are drawn on the

787060.3　　　　　　　　　　　　　　9

payroll account. Debtor maintains regular and detailed records of any transfers among the three active accounts.

49. Closing these accounts would be detrimental to Debtor's business. Debtor has certain performance bonds, and the payments to be made to Debtor thereunder are required to be paid into one or more of Debtor's current accounts.

50. In the ordinary course of business, Debtor uses numerous business forms in connection with its operations, including, but not limited to, letterhead, purchase orders, invoices, contracts, and checks (the "Business Forms"). Prior to the filing of this bankruptcy case, the Business Forms identified Debtor as "Phoenix Heliparts Inc." without reference to Debtor's status as a debtor-in-possession.

## VI. UTILITIES.

51. Utility services are essential to Debtor's ability to sustain operations. In the normal conduct of its business, Debtor has relationships with approximately eight utility companies for the provision of telephone, electric, water, internet access, and other services.

52. Any interruption of utility service to Debtor's business would be severely disruptive and diminish Debtor's ability to reorganize. In particular, if local utility providers were permitted to terminate or disrupt service to Debtor, Debtor's operations would be paralyzed, and Debtor's work on vital aircraft could be seriously jeopardized.

53. Certain utility companies provide Debtor with services necessary to run its day-to-day office operations. For example, Debtor is extremely reliant on electrical service to accomplish technical physical work on aircraft. Debtor is dependent upon internet and telephone service to maintain its ability to send and receive electronic communications and records.

54. The facilities operated by Debtor require a full complement of utility services for the health, safety, and welfare of employees and the safeguarding of valuable aircraft equipment.

55. Debtor has already posted deposits with one of the utility companies to ensure Debtor's payment obligations, as stated in the first-day motion relating to utilities.

## VII. RETENTION OF CARMEL LTD.

787060.3                              10

Case 2:15-bk-12003-DPC   Doc 5   Filed 09/18/15   Entered 09/18/15 16:13:32   Desc
Main Document    Page 10 of 11

56. Debtor has consulted Michael W. Carmel Ltd. ("Carmel Ltd.") as restructuring counsel. Debtor selected Carmel Ltd. as its attorneys because of the firm's recognized expertise in the field of debtor's protections, creditors' rights, and business reorganizations under chapter 11 of the Bankruptcy Code, as well as in other areas of law related to these bankruptcy cases, such as litigation matters.

57. Debtor believes Carmel Ltd. has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of Debtor's bankruptcy case.

58. Debtor believes that Carmel Ltd. is both well qualified and uniquely able to represent Debtor in this case in a most efficient and timely manner.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 18 day of September, 2015, at Mesa, Arizona.

_____
Andy Gutierrez
Controller
Phoenix Heliparts Inc.